The United States Court of Appeals for the Fifth Circuit is now open for reading tomorrow. God save the United States and its Honorable Court. And we begin with Texas Corn Producers v. U.S. Environmental Protection Agency. Mr. Conde. Good morning, Your Honors, and may it please the Court. James Conde for the petitioners. Agencies must engage in reasoned decision-making. That includes a duty to provide reasoned, non-conclusory explanations, a duty to respond to significant comments, and a duty to consider alternative data invited by the agency and submitted during the notice and comment process. EPA failed to meet those obligations here. You don't have to take my word for it. On page 29 of EPA's brief, EPA, quote, acknowledges that it did not fully respond to comments on the proposal, unquote. This case arises from EPA's decision to amend the fuel economy test procedures to transition to a test fuel with a lower energy density. That change triggered EPA's obligation to adjust the test procedures to ensure comparable results. That duty is important. It protects the exclusive role of the Department of Transportation in ensuring that the stringency of the CAFE is set at the maximum feasible level, and it protects the exclusive role of Congress in setting the gas guzzler tax. To carry out that duty here, EPA relied on its own in-house testing program of only 11 vehicles. It then analyzed the data from only 10 of those vehicles. So I'm sorry to interrupt you, but like you say, EPA comes pretty close to conceding that the responses to the comments was inadequate and devotes, I think, most of its brief to standing. So it seems to me the hardest part of your case is to say, well, we aren't directly regulated by this, although you may disagree. So what kind of argument do you have to—what do we have to accept to conclude that your clients are injured by this allegedly inadequate rule? So I think there are three factors that the court should consider. So first, common sense. The very object of the program here is to reduce fuel consumption, to reduce the products that the petitioners, my clients, sell. So they're the direct targets of the program. So even if the program—the means the program achieves its ends is by regulating automakers. The very target of the program are the petitioners here. So as a matter of common sense, I think they would be harmed by an increase in the stringency of the fuel economy standards. Then, as a matter of basic economics, this court should assume that automakers follow incentives. And so if they're going to be penalized for failing to increase the stringency of the fuel economy standards, it would assume that automakers would increase their fuel economy, which would have predictable effects on my clients. And then I think record evidence here, too, right? Meaning less gas sold? Right. If they increase fuel economy? And as a matter of evidence, we also have here an affidavit from an expert that relies on the agency's own model of automaker behavior, which predicts that automakers will respond to the increase—to the sort of de facto increase in fuel economy by reducing fuel consumption. That's the Taylor-Meyers Declaration, which relies on the Department of Transportation's own model of automaker behavior. EPA doesn't actually dispute that compared to an R factor of 1, the R factor that we think is correct, its sensitivity factor will increase the stringency of the fuel economy standards effectively by 0.52 percent. So that's actually a pretty significant increase in stringency. It's equivalent to about a billion dollars in fines, and the Department of Transportation routinely considers increases in stringency of about 0.5 percent. So when you look at their Notice of Proposed Rulemakings, you'll see the Department of Transportation will say, should we increase stringency by 0.5 percent? Should we increase stringency by 1 percent? By 1.5 percent? That's the magnitude of what we're talking about here. And really, I think there should be no question here about our petitioners standing. They sell 9 billion gallons of fuel each year, represent about 12,000 gasoline stations. All their petitioners here sell raw materials used to make fuel. So they will likely suffer $1 worth of harm, which is all that we need to show here. Under this court's case law, including Texas Manufacturers Association, National Infusion Center, and many other cases from the Supreme Court, I would cite, for example, the Supreme Court census case, right, that says the court can rely on predictable effects. We have standing. So I think the only other question is the question of remedy. I think to get remand without vacater, the burden is on EPA, and it has to show two things. So first, it has to show a serious possibility that it could correct the error on remand, and also that vacater would be disruptive. But it fails to meet either requirement here. So EPA fails to prove that it could surmount all of the technical deficiencies we raised in our brief, which are many. It just says it could, but it never explains how it would. And tellingly, EPA here is conducting an entire new rulemaking and an entire new test program to try to overcome all of the deficiencies that we raised in our opening brief. So I don't think there's any real argument that EPA has met the first factor, showing that it could fix the error on remand. Second, EPA fails to prove that remand here would be disruptive. EPA essentially says that because manufacturers will have to test for greenhouse gases using E10, then they will have to run another set of tests on fuel economy using the E0 test fuel, that that would be disruptive. But EPA can easily fix that problem. EPA can just delay testing with E10 for greenhouse gases as it has done for the last ten years, and that would avoid any disruption. This court could also help EPA avoid disruption. You could remand the regulation requiring EPA to transition, or manufacturers, rather, to transition to a new test fuel. That regulation is 40 CFR 600.101C. And if EPA wants to, it can just continue delaying greenhouse gas testing with E10 for the foreseeable future until it fixes the sensitivity factor. Is that remedy allowed to us under the EPA? Well, this court has said that remand without vacater is allowed, and EPA has actually sought remand without vacater of that regulation specifically when it moved. Yeah, moved for that. Right. And so, you know, this court's precedent says it's allowed. Okay. So you're asking us to require manufacturers to do something? You're saying that's a good remedy? Excuse me. I thought I heard you say requiring manufacturers to do some testing, different testing. Oh, no, no, no. So that's required by EPA's regulation. So what EPA is saying is if you vacate the regulation here, manufacturers would, because you're not vacating the regulation that applies to greenhouse gases, manufacturers would be required by default to run two different sets of tests. But I don't think that's actually necessary because EPA can delay that testing, as it has done for the last 10 years, to keep both fuel economy and greenhouse gas testing the same until it fixes the regulation that we're challenging here. But we would not be telling them to do that in your view? Correct. Correct. That's optional. EPA can avoid that disruption if it wants to. And if it's really that disruptive, it can do so. And I will also say that EPA has not shown that double testing would be disruptive anyway. So EPA has previously estimated that the testing costs incurred by automakers to test on E0 and E10 are, quote, well under $2 million. That's on footnote 6 at JA53. Now, to be fair to EPA, that's only for a subset of vehicles, what EPA calls emissions data vehicles. That's about a third of the vehicles. But really we're talking under $6 million, if you do the math. But under $6 million is a lot less than $1 billion, the fines threatened by EPA's de facto increase in the fuel economy standards. So $6 million nationwide? $6 million nationwide. That would be the testing costs as estimated by EPA, less than that. That compares to $1 billion in threatened fines. So, you know, the automakers are not here, obviously, but I think in terms of a balance of harms, EPA's increase in stringency far outweighs any disruption from increased testing. Well, I could get into the merits, but if ‑‑ On the merits, I believe one of the arguments that EPA makes is that your clients concede or someone on your side concedes that a 15, 16, or 18 vehicle test would be okay, and yet you're complaining about an 11 vehicle test. What's your response to that? So we have not conceded that. You're just saying that alternative data is better than EPA's, right? And it disproves what EPA's conclusion here. But it's also not true that it's only 16 vehicles. It's 41 vehicles, as we explained in our reply brief. And collectively, those studies tested over 70 vehicles, right? So if you look at that study collectively, right, that's far better than just 10. Also, so it's not really a question of opinion whether those studies are, you know, better or worse than EPA. You can calculate the uncertainty and the sensitivity factor determined by those three studies. It's far less than the uncertainty and the R factor determined by EPA. We explained that in our comments. That's at JA45 and JA157. Okay. Thank you. All right. You've saved time for rebuttal, or you can use the rest of your time now. That's up to you. The court has no further questions. All right. You've saved time for rebuttal. Thank you, Mr. Condie. Thank you. Mr. Lin. Good morning, Your Honors. Albert Lin for the United States. I'm joined by Seth Nolbaum at counsel table from the EPA. May it please the Court. I'd like to discuss two points today to explain why this Court should dismiss or deny this petition for review. First, petitioners lack standing to challenge EPA's R.A. factor. Second, should this Court reach the merits, EPA reasonably set the R.A. factor at .81, based on its own study in which it examined the requisite number and types of vehicles and properly vetted its own data. EPA also reasonably declined to rely on the data and other studies that petitioners point to here. Now, if this Court disagrees with EPA on the merits, the proper remedy here is remand without vacater. Beginning with the issue of standing, Your Honors, I want to make clear here that petitioners are not the object of the EPA regulation at issue. The R.A. action simply instructs automakers how to calculate whether their vehicle's fuel economy in order to determine whether or not they actually comply with the fuel economy standards. The object of this regulation is not to reduce fuel consumptions, as petitioners just represented. Do they have to, in your view, do they have to be the object in order to have standing, or can they have standing even if they were to concede that they're not the object? I recognize that this Court's precedent shows that they can be, they can still have standing even if they're not the object, but the bar is substantially higher when they're not the object, which is the case here. And just to illustrate that, I want to point out that, unlike in Energy Future Coalition, where the petitioners there were actually barred from participating in the test fuel market, the R.A. action here doesn't bar petitioners from any market at all. And unlike in Contender Farms, where the horse exhibitors were participating in the regulated activity of horse shows, petitioners here are not involved in the fuel economy calculation process at all. Are you saying that it's unlikely that they will suffer loss of sales, of revenue, of volume? Yes, Your Honor. In addition to the fact that they're not the object of the regulation here, automakers actually have a variety of compliance options available to them to cover any small gaps that would be the result of an under-calculation from the R.A. factor. Notably, many of those options actually do not require the automakers to make their vehicles more fuel efficient or consume less fuel. And the fact that automakers have these options here gets us to the crux of the flaw in petitioner's entry argument. They simply do not provide sufficient evidence to show that automakers will choose to pursue a route that will lead to reduced fuel consumption. What's the purpose of the CAFE program, then, if it's not to reduce fuel consumption? Well, yes, the purpose of the CAFE program is to reduce fuel consumption. So is the premise of your argument that it doesn't work? No, Your Honor. I think we have to make very clear that there is a difference between the NHTSA fuel economy standards, which, again, its purpose is to reduce fuel consumption, and EPA's R.A. action here, which is simply to provide a method for automakers and EPA to calculate automakers' vehicle fuel economy. But they're saying their merits argument is that it's too stringent, the R.A. factor is too stringent, right? Yes. Maybe it is, maybe it's not. But they're saying it's too stringent. So if it's too stringent, won't the effect of that be even less fuel consumption? Not necessarily, Your Honor, because— Possibly. It really depends on what automakers choose to do in response to the allegedly low R.A. factor. Again— Well, you'd have to assume they're going to choose to avoid these fines that they could be subject to if they don't reduce fuel consumption and make it more efficient. Certainly, and there's—well, actually, I would disagree with the initial premise, because some automakers, as NHTSA has found, have actually chosen to pay fines. But on top of that, there are other options that automakers can pursue to avoid the payment of fines. As we explained in our brief and the Dunham Declaration, one of the many options here is for them to shift the composition of their fleets so that they produce more large vehicles that are less fuel efficient and fewer small vehicles that are more fuel efficient. And in that scenario, automakers would actually— or ultimately, there would be more fuel consumption overall. And in fact, automakers have pursued such a tactic over the last decade, as NHTSA has found. Specifically, automakers have reduced their production of smaller vehicles by 30 percent and increased production of larger vehicles by a corresponding 30 percent. And this has led to an aggregate increase of 5.4 percent in the average vehicle footprint. In other words, automakers can upsize their vehicles and vehicle fleets. They have upsized their vehicles and vehicle fleets. And so it's very plausible that they will do so in response to an allegedly low RA factor. Returning to the issue— I guess just following that, surely—I mean, you tell me if I'm wrong. That couldn't be desirable from the point of view of the EPA and NHTSA, a shift to larger footprint vehicle fleet. We recognize that this is a problem, but NHTSA has explained that the cure to that problem is to have large stringent increases. And so NHTSA's fuel economy standards for model years 2027 through 2031 require increases on the scale of 2 percent per year. In contrast here, what we're looking at with the alleged increase in stringency from the RA factor is just 0.52 percent, which NHTSA has found automakers aren't able to actually bridge that gap via the fleet composition shifting methodology. So our position is that the fuel economy standards work, but it has to have large increases to actually work. It can't just be small incremental increases on the scale that the RA factor would have here. So returning to the issue of injury, petitioners rely on NHTSA's modeling to argue that there would be reduced fuel consumption. But I want to make clear here that NHTSA's modeling was designed to examine how automakers might respond to changes in the fuel economy standards, not to changes in the RA factor. So their reliance on that modeling is inept. And as I just said, NHTSA has found that automakers aren't able to bridge the gaps that we're talking about, the small gap here that we're talking about, via changes in their fleet composition. Now given the fact that automakers can actually choose how to respond to the RA factor, that shows that petitioners actually have a traceability issue here as well. Petitioners do not deny that their alleged injury is actually many steps removed from EPA's action here. It is also contingent on the choices of multiple independent third parties. Now as we explained in our briefs, one of the chains of causations that petitioners have to rely on has at least three links here. First, automakers have to actually choose to make their vehicles more fuel efficient and consume less fuel in response to the RA factor specifically. Then, car buyers have to actually go out and purchase those vehicles, and those car buyers would then have to take those vehicles to a gas station that is owned or supplied by one of petitioner's members. And that is the shortest chain of causation that they can point to here. Given the level of attenuation that we're talking about, Your Honors, this court has to require petitioners to provide more than just their reliance on common sense to find that petitioners have standing. Otherwise, this court would open Article III's floodgates to anyone who could plausibly trace a line from a regulation to a product that they sell. So the plaintiff associations here are both sellers of fuel, right, but also sellers of corn and sorghum, which is something that's going to go into the gas, right? So forget the sellers of fuel. The producers of sorghum and corn, they're selling on a volume basis, right? They're just selling out there. You wouldn't have to trace some corn that they sold to some— I guess you wouldn't have that sort of chain of attenuation with respect to a corn producer. Well, there's still certainly a degree of attenuation there, and I think this really raises the question of where do you draw the line, Your Honors, because by that reasoning, wouldn't the fertilizer producers who sell fertilizer to these corn producers have standing? What about the Canadian potash miners who sell potash to be put into the fertilizer? So really, petitioners have to actually prove each link in the causal chain and actually show that every injury that they're alleging here is actually connected to the RA factor. They cannot just invoke common sense. Now, turning to the last issue of standing here, redressability, I want to point out that petitioner's own expert witness admits that there are multiple factors that will drive automakers to make their vehicles as fuel-efficient as possible, and given that it is petitioner's burden here to establish that they have standing, they cannot just ignore their own expert witness's position here and satisfy that burden. In short, Your Honors, the evidence before the court does not show that automakers will respond to the RA factor in a way that will reduce fuel consumption. In turn, petitioners have not shown that their alleged injury is reasonably likely, much less certainly impending. Similarly, petitioners have not provided sufficient evidence to show that every link in their causal chain is traceable back to the RA factor and not NHTSA's fuel standards, which I want to reiterate is not the same thing that we're talking about here, nor have they shown that this injury is actually redressable by the court. Turning to the issue of the merits, Your Honors, EPA reasonably set the RA factor at .81. EPA also reasonably rejected petitioner's other concerns here. On the number and types of vehicles, EPA analyzed data from 11 vehicle models tested using E0, which is the prior test fuel that didn't have any ethanol in it, and E10, which is the current test fuel that is 10% ethanol by volume. EPA, once upon a time, this was decades ago, admittedly, said it would need at least 75 to 100 test vehicles, which is several orders of magnitude greater than what was actually used here. Yes, Judge Smith, and I would actually say that EPA's testing program here was consistent with that statement because when that testing was conducted, EPA requested that many vehicles because it knew that the testing entity could not control for test-to-test variability as well as EPA had control for test-to-test variability here. And really, there's an inverse relationship between test-to-test variability and the number of vehicles that you need. So the more that you control for test-to-test variability, as EPA has done here, the fewer vehicles that you need. And I want to get to a point that Judge Duncan raised earlier. If you actually look at the Catalyst Durability Study, and that's on pages JA191 through 93, that's a short summary of it, and then page JA281, that study actually only looked at five different vehicle models. So petitioners are correct that we misstated that in our brief. They only looked at five vehicle models to come up with an adjustment factor. So really, petitioners' concerns here, they can't have their cake and eat it too in terms of the number of vehicles that we're looking at. As for the types of vehicles that EPA tested here, EPA explained that the vehicles that it used were compliant or nearly compliant with Tier 3 certification standards. And this is consistent with EPA's prior statement that its R factor analysis should be based on vehicles that were Tier 3 level. In terms of how EPA treated the vehicle's data, EPA explained that it excluded the ACCURA's data because, one, it was octane sensitive, and, two, it produced unexpected results. Now, I want to emphasize that the octane sensitivity thing is a real problem here because EPA actually tried to choose vehicles that were not octane sensitive because octane sensitivity can actually skew the adjustment factor results. In contrast, while the Malibu One did experience some issues during the testing process, EPA explained that it was able to cure most of those issues, many of which wouldn't have affected the RA factor calculation at all. And the Malibu One's test results ultimately did fall within the expected range of performance. What was unexpected about the results of the ACCURA test? I think part of it was that it was octane sensitive, which, again, EPA tried to choose vehicles that wouldn't be octane sensitive because what EPA was really looking at in determining the RA factor is the difference in energy density between E0 and E10 test fuels. So the fact that a vehicle is octane sensitive can really skew those results. Okay. Lastly, EPA reasonably rejected the commenter's suggestions to use the automaker-provided data as well as data from other studies. EPA explained that it declined to use the automaker data because the automakers did not properly control for test-to-test variability. And, in fact, in their own comments on the record, automakers did not deny that they failed to control for multiple sources of test-to-test variability, nor did automakers provide any responsive comments to mitigate EPA's concerns regarding their failure to control for test-to-test variability. So this is you reasonably rejected their comments and not your admission that you didn't consider comments about the methodology.  I acknowledge that EPA could have provided a more fulsome response in the response-to-comments document. But if you look through the record, EPA did think about these issues, and you could reasonably discern why EPA made the decisions that it made here. In your view, is that enough to comply with the APA's requirements, or is it not enough and it really does need to go back, whether we vacate or not, whether they're standing or not, assuming they're standing, it needs to go back so EPA can do a better job of responding? I think the standard here is whether or not APA reasonably considered important factors, and I would say that it did here. Okay, but we couldn't reach that result by simply looking at EPA's response to the comments. I agree that you would have to look at the whole record here, not just the RTC document. As for the other studies, EPA reasonably explained that it couldn't rely on those studies because they were actually designed for a different purpose and didn't account for other variables that EPA was looking at. For example, one important distinction between EPA's study here is that it was looking only at the impacts between E0 and E10. In contrast, the other three studies that petitioners have pointed to also all looked at E15 and E20. Now, this is problematic because, as the record shows at JA197, a higher level of ethanol content would actually skew the adjustment factor results even higher. In that case, that means that the data from those three studies was not reliable for the purpose of identifying the adjustment factor between E0 and E10 here. Under these circumstances, Your Honors, this Court can reasonably discern EPA's decision-making process here and should uphold the RA factor. However, if this Court should disagree on the merits, the proper remedy here is remand without vacater. I want to note here that petitioners are now actually suggesting a whole new remedy that no one has discussed before of EPA delaying the testing for greenhouse gases. But the reality here is that EPA can't just do that at the drop of a hat. EPA would have to conduct a whole new rulemaking. And so even in that scenario, petitioners and automakers would be injured by the delay that is required for EPA to conduct the rulemaking process. But let's talk about the remedy that petitioners actually suggested in their reply brief. So I want to note that first, on remand, EPA is able to justify the 0.81 RA factor if this Court should require it. EPA can provide more explanation of its analysis, and it's actually not unreasonable to think that EPA can land at 0.81 again. Notably, if you actually exclude the E15 and E20 data from the other three studies that petitioners point to, they actually produce an average adjustment factor of 0.85. I recognize that that's not the same thing as 0.81, but there are other flaws with those studies as well. Now, turning to the impacts of vacater here, I want to note that petitioners clarified for the first time in their reply that what they're seeking is the vacater of 40 CFR section 600.113-1201. Now, that's the specific section that actually includes the calculation formula that applies the 0.81 RA factor. Now, if you actually vacate that provision as petitioners request, that would require automakers to revert to using the 0.6 adjustment factor that EPA had set in place back in 1984, while also still using E10 as a test fuel. Now, this is problematic for two reasons. First, all parties here actually agree that an adjustment factor of 0.6 used in conjunction with E10 test fuel is too low, and it would not actually produce results comparable to the 1975 testing procedures. This contravenes the plain text of the Energy Policy and Conservation Act. Second, to the extent that you believe that petitioners would be harmed by the 0.81 RA factor here, a 0.6 adjustment factor would actually double the harm that petitioners suffer. It would also double the harms that would fall upon automakers. Under these circumstances, Your Honors, if the court agrees with the petitioners on the merits, it should remand the RA factor without vacater to minimize the harms to petitioners and automakers. The idea that if we vacated the 0.81, they would have to do testing under a 0.6 RA factor. Is that right? But everybody recognizes that a 0.6 RA factor is not in accordance with the law, right, because it hasn't been updated. That's correct. So I may be missing it. Why would they have to do a 0.6 factor? Because vacating that specific provision would put the prior provision, which had the 0.6 factor and that used in the formula, back into place. But we all know that one is illegal, right, because that one has not been updated. It would be improper to use with the E10 factor, E10 test fuel. I think one way that this court could approach it is to vacate not only the 0.81 factor but also the provisions requiring automakers to test using E10 test fuel for greenhouse or not greenhouse gases, for fuel economy. That way they can revert to using E0 test fuel and apply the 0.6 RA adjustment factor, which they had been doing up until this rule. Okay. Thank you. For these reasons, Your Honors, we ask that this court dismiss or deny the petition. Thank you. Thank you, Mr. Lynn. Mr. Conde for rebuttal. Why don't you start with you heard Mr. Lynn's explanation of reverting to 0.6. Right. So that's a new argument I haven't heard before, but I think it's wrong. To the extent it's right, though, then this court should also vacate 40 CFR 600.101C, the regulation I talked to before, which is the regulation that actually requires the transition to E10. Which is what he just explained we could do. Is that right? Right. Right. So if you vacate that regulation, then testing goes back to E0 for both greenhouse gases and fuel economy, and there's no harm because the harm here arises from the lower energy density of the test fuel and the R factor. So if you just go back to the E0 test fuel, we're back where we started, nobody's injured, and petitioners are better off. So I don't think that really helps them. The other arguments I heard, I heard a lot. Is it properly before us that we could do that? Yes. In fact, EPA sought a voluntary remand of that precise regulation when it moved for a voluntary remand. So it acknowledges that it is before this court. So I heard also a lot of new merits arguments today. I just want to point the court to what EPA actually said in the response to comments. It's JA37. So when we explained in excruciating detail why the sample wasn't big enough, why EPA was testing the wrong vehicles, EPA's only response is, quote, the adjustment was generated from a study carefully designed and rigorously conducted in EPA's lab, unquote. That is the epitome of a conclusory and unreasoned response. Then as to the Malibu 1, we explained in great detail why that vehicle should not have been included. It had an accelerated fault code repeatedly occur on the highway E0 tests. As the auto manufacturers explained, that causes parasitic losses in efficiency, introducing a clear bias into the data. The data itself shows that the vehicle was behaving oddly, and it was the only vehicle that behaved worse than the open-loop carbureted engines of the 1980s when adjusting to the test field. So EPA's response at JA37, again, the decision to include data from the 2013 Malibu was based on its performance being in the expectant range. That's all EPA said. And then on the Acura, EPA did not even respond to any comments. It said nothing at JA37. Now what EPA now says when it's arguing is that because the sample was large enough here because it reduced test-to-test variability. That's its argument. But that doesn't address the second source of uncertainty, that is the uncertainty between the vehicles. And you can hypothesize here EPA just testing one vehicle a million times, that study is still going to be junk because you are not accounting for the variance between the different vehicles. So EPA here did not wrestle at all with the question of variance between the vehicles. And last on standing, I don't think standing is complicated here. Paying penalties is not a compliance option. We have a model that accounts for the regulatory credits that EPA hypothesizes. That model shows that there are not enough credits for manufacturers to adjust without increasing fuel economy. Is that in the Myers Declaration? Right. Okay, so what I heard, maybe I misheard, is that the reason the Myers Declaration according to EPA is not relevant is because it's not measuring the effects of a change in RA. What it says is a minor change in RA. It's measuring something else. It's measuring increased, I don't know, increased fuel economy of vehicles. What is your response to that? I don't understand that argument. I mean it's modeling the increase in stringency due to the RA, which is a de facto increase in the stringency of the fuel economy standards. So it's perfectly reasonable to use the CAFE model to model that response. Okay. The Court has no further questions. Thank you, Mr. Condi. Your case is under submission. Next case for today, Olusi v. City of Frisco.